# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BEVERLY L. GIBSON,         )
                                )
          Plaintiff,         )        No. 08 C 3924
                                )
          v.               )        Judge Edmond E. Chang
                                )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security,    )
                                )
         Defendant.       )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Beverly L. Gibson, seeks judicial review of a final decision by the Commissioner of the Social Security Administration, denying her disability insurance benefits and supplemental security income under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), and 1614(a)(3)(A). The parties have filed cross-motions for summary judgment. R. 19, 21.[1] For the reasons stated below, Defendant's motion for summary judgment is granted [R. 21], and Plaintiff's motion is denied [R. 19].

## I.

In July 2005, Gibson applied for disability insurance benefits and supplemental security income, alleging that she was disabled since November 30, 2003. Tr. 256.[2] The SSA denied Gibson's application both initially and upon reconsideration. Tr. 249-52. In May 2006, Gibson filed a timely written request for a hearing before an administrative law judge (ALJ). Tr. 256. On February 15, 2007, Gibson, represented

---

[1]Federal jurisdiction arises under 42 U.S.C. §§ 405(g), 1383(c)(3).

[2] "Tr." refers to the administrative transcript filed as docket entry 15.

by counsel, appeared and testified before the ALJ. Tr. 185. A vocational expert was the only other witness who testified. Tr. 186. On October 30, 2007, the ALJ issued a written decision denying Gibson's claim for benefits. Tr. 268. The SSA's Appeals Council denied Gibson's request for review of the ALJ's decision on May 10, 2008, making the ALJ's decision the final decision of the Commissioner under 42 U.S.C. §§ 405(g), 1383(c)(3). Tr. 1-3; 20 C.F.R. § 404.981. Gibson filed this case in July 2008, and the case was reassigned to this Court in January 2011.

## II.

### A.

Gibson was born in 1967, and was 36 years old at the time of her alleged disability onset date. Tr. 267. She has four children and is separated from her husband. Tr. 318. Gibson completed high school and around two years of college. Tr. 194. She worked as a data entry clerk from January 1995 to November 2003. Tr. 195-96, 383. In November 2004, Gibson worked for a few months as a customer service representative at a telephone sales company. Tr. 383. In 2005, Gibson became a store manager at a telephone sales company and was also self-employed as a babysitter. Tr. 195, 383.

### B.

Gibson, represented by counsel, appeared and testified before the ALJ. Tr. 185. Gibson testified that she was let go from her job as a store manager in 2005 because she was sick too often. Tr. 195. Before moving to Chicago in 2005, she worked for various agencies in New York as a temporary secretary and data entry clerk. Tr. 195-

96.  However, Gibson stated that she can no longer do this type of work because she would get sick on the job.  Tr. 196.  She has not looked for any type of employment since 2005.  Tr. 197.

The ALJ asked Gibson about her physical pains and symptoms.  Tr. 208.  Gibson testified that she experiences numbness in her hands every day and it makes sleeping at night difficult.  Tr. 208, 219.  Gibson testified that the pain travels up and down her arms.  Tr. 209.  Gibson's physician never explained the cause of the numbness, but he prescribed Gabapentin to treat it.  Tr. 208.  She stated that she has never had any testing done on her hands, nor has she ever worn wrist braces.  Tr. 209.  Gibson also experiences sharp, stabbing pain in her lower back "most of the time."  Tr. 209-10.  She stated that the pain travels down to the backs of her legs.  Tr. 210.  Gibson testified that she also has "straining pains" and weakness in her legs, such that it is difficult for her to climb multiple flights of stairs.  *Id.*  She has headaches twice per week and they typically last for a few days.  Tr. 211.  Gibson stated that she takes Ibuprofen to treat the headaches.  *Id.*

Beginning in 2005, Gibson testified that she saw a neurology specialist, Dr. Skias, every three months.  Tr. 200-02.  She testified that part of the reason she moved from Georgia to Chicago was to be closer to a neurologist.  Tr. 222.  Gibson's sister, who lived in Chicago, noticed Gibson's depression during one of Gibson's visits and urged Gibson to stay in Chicago and see a neurologist.  *Id.*  Gibson agreed, and relocated to Chicago in May 2005.  Tr. 221.  Gibson testified that Dr. Skias admitted her to the hospital in July 2006, where she stayed for five days.  Tr. 200.  Gibson testified that

Dr. Skias was not treating her for a seizure disorder and that she had not spoken to any doctor about seizures for some time. Tr. 207. She stated that she typically has one to two seizures per year and the last one occurred in October 2006. Tr. 208. Gibson testified that she does not know what causes the seizures; some of them occur while she is sleeping. Tr. 207-08.

Regarding her mental health, Gibson testified that her depression makes it hard for her to go out and talk to people. Tr. 211. She frequently has suicidal thoughts and cries for no reason almost every day. Tr. 211-12, 221. She stated that she attempted suicide twice – once in 1989 and once in 1997. Tr. 220. Gibson testified that she had an alcohol problem and used to drink at least five times per week, having four to five drinks each time. Tr. 214-15. She stated that she cut back her drinking around the end of 2005, when she started having more suicidal thoughts. Tr. 215. Gibson testified that she drank a little bit on special occasions in 2006. *Id.* Specifically, she stated that she had three glasses of wine for her sister's birthday in June 2006, one glass of wine on Christmas, and one glass of wine on New Year's Eve. *Id.* Gibson testified that she often feels confused and has trouble concentrating or remembering things. Tr. 219-21. She stated that she will sometimes go several weeks without sleeping and days without eating. Tr. 220-21.

Gibson testified that she began receiving mental health treatment at the University of Illinois at Chicago (UIC) in September 2005. Tr. 202. She stated that she saw a psychiatrist, Dr. Mark Johnson, twice per month. *Id.* Gibson testified, however, that she missed two or three appointments and was referred out of UIC in

October 2006.  Tr. 203.  At the time of the hearing, she had not seen Dr. Johnson or any other psychiatrist since October 2006.  *Id.*

Gibson testified that, in January 2007, she went to see her primary care physician, Dr. Anjum Hussaini, located at the UIC medical campus.  Tr. 198.  She stated that she felt very weak and her physician decided to admit her to UIC's hospital.  *Id.*  Upon being discharged from UIC, the physicians advised Gibson to follow-up with her neurologist.  Tr. 198-99.  As of February 15, 2007, the date of her hearing, she had not followed this advice.  *Id.*

Gibson testified that she was admitted to the hospital again on February 5, 2007, a few weeks before her hearing.  Tr. 197.  She stated that she went to the hospital – this time Evanston Hospital – because she could not walk or do anything around her house.  *Id.*  At Evanston Hospital, Gibson had magnetic resource imaging (MRI) done on her back, neck, and lumbar.  Tr. 205-06.  She testified that the physicians at Evanston reported that she has a disc disease and a split disc in her lower spine.  Tr. 197-98, 206.  They referred her to come back and see the spine surgeon and neurologist.  *Id.*  Gibson had not scheduled any appointments as of the date of her hearing.  *Id.*  The Evanston physicians also referred Gibson to outpatient physical therapy.  Tr. 198, 205.  Again, Gibson had not yet scheduled these follow-up appointments as of February 15.  *Id.*  Gibson testified that the Evanston physicians gave her a walker to use and help alleviate the pain in her leg and nerve.  Tr. 205.  She

brought the walker to the hearing, but did not know how long she would need it for. *Id.*

Before her February 2007 hospitalization, Gibson testified, she could only walk 100 feet before getting tired. Tr. 213. She stated that she could only stand for five minutes a time because the "sharp straining pain" in her back prevented her from standing any longer. *Id.* Gibson estimated that she could only sit for one hour before her back would start hurting. *Id.* She testified that she could only lift five pounds. *Id.* Gibson stated that she has trouble grabbing and holding on to things, especially with her left hand. Tr. 214. However, she testified that she is able to do certain tasks, such as pick up coins off of a table and button a blouse. *Id.* Gibson admitted that none of her doctors imposed limitations on her physical abilities. Tr. 213.

At the time of the hearing, Gibson was taking several medications including Bisoprolol and Depakote. Tr. 203. She also stated that she recently started taking pain medication that was prescribed during her February 2007 hospitalization. Tr. 204. Gibson testified that she has never taken medication for multiple sclerosis. Tr. 205. The medications she does take cause some side effects, including nausea, vomiting and diarrhea. Tr. 212.

The ALJ also asked Gibson about her lifestyle. Gibson testified that her daughter typically drives her places because Gibson's driver's license is expired. Tr. 194-95. She occasionally takes public transportation. Tr. 195. On a typical day, Gibson mostly sleeps or watches television. Tr. 216. She does not grocery shop, cook meals, wash dishes, or do laundry. *Id.* Gibson stated that her daughter does all of

those chores.  *Id.*  Occasionally, Gibson will do some cleaning around the house, but the numbness in her hands prevents her from doing the dishes.  *Id.*  She stated that she cannot do laundry because she is unable to lift the laundry bags and her back pain makes it difficult for her to bend over and get to the machines.  Tr. 216-17.  Gibson testified that she is able to bathe and dress herself when she is not in pain.  Tr. 217.  For exercise, Gibson stated that she occasionally walks, does leg lifts, and bends over to touch her toes.  *Id.*  Gibson testified that she rarely leaves the house and has not left the City of Chicago since she moved there.  Tr. 218.  She does not visit with friends or family.  *Id.*

## C.

Medical documentation in the administrative record covers the period between 2001 and 2007.  In 2001, Gibson was seen at Jamaica Hospital in New York, where she had an MRI of her brain.  Tr. 449.  The MRI results showed a multiple bilateral cerebral lesion and "[t]he differential diagnosis include[d] a lacunar infarcts, parasitic infestation, and less likely a MS."  *Id.*  In 2004, Gibson left New York and moved to Georgia for a short period of time.  There she sought treatment from Dr. Robert Jones for complaints of headaches, dizziness, and high blood pressure.  Tr. 261, 439-48.  Dr. Jones treated Gibson from November 2004 through March 2005.  *Id.*  In addition to prescribing anti-hypertensive medication for elevated blood pressure, Dr. Jones prescribed antidepressant medication for complaints of fatigue, anhedonia, and crying spells.  Tr. 261.

Gibson moved to Chicago in 2005. On July 5, 2005, Gibson went to Evanston Hospital and complained of chest pain. R. 452. She acknowledged that she had not taken her blood pressure or antidepressant medication in a month and explained that she had been off and on these medications for a couple of years. Tr. 453. Gibson stated that her family members reported absence-type seizures. Tr. 454. Her chest computerized tomography (CT) scan and electrocardiograph (ECG) were normal. Tr. 460-61. Gibson was discharged in good condition and instructed to make a follow-up appointment as needed. Tr. 457.

In August 2005, a state agency medical consultant, Dr. Richard Bilinsky, assessed Gibson's physical residual functional capacity (RFC). Tr. 472-79. He found that she did not have any limitations, as a recent physical exam was largely unremarkable. *Id.* Dr. Bilinsky also noted that Gibson was neurologically intact and "[o]ther than the precautions associated with a seizure disorder, she is not physically limited." Tr. 479. Dr. Bilinsky's assessment was affirmed by another state agency medical consultant on March 20, 2006. Tr. 541-43.

Because Gibson complained of affective disorder on her Social Security application, and because Gibson had not noted on the application any formal mental health treatment, the SSA arranged a psychological consultative examination for Gibson on September 13, 2005. Tr. 262, 467. Dr. Norton Knopf performed the evaluation. Tr. 467. Gibson told Dr. Knopf that the depression she experienced for the past two years had adversely affected her work performance and personal relationships. *Id.* She reported feelings of guilt, fatigue, anxiety, and insomnia. Tr.

468. Gibson stated that she was prescribed Zoloft for her depression. Tr. 469. Gibson also admitted to drinking alcohol for about four years and that her last drink was one week before her consultation. Tr. 468. Dr. Knopf noted that Gibson's pattern of alcohol abuse is marked by binge drinking. Tr. 469-70. Dr. Knopf observed that Gibson's attention and concentration skills were normal and that she was fully oriented. Tr. 469. He noted that Gibson's mood was depressed, but there were no indications that she was not competent to manage her own affairs. Tr. 471. Dr. Knopf diagnosed Gibson with major depressive disorder and alcohol abuse. *Id.*

On September 30, 2005, Dr. Taylor Russell, a state agency medical consultant, reviewed Gibson's file and concluded that she "retains the capacity to understand, remember and carry out simple tasks and perform [substantial gainful activity]." Tr. 482. Dr. Russell's mental RFC assessment noted some areas where Gibson was moderately limited including, for instance, her ability to understand and remember detailed instructions. Tr. 480. Other moderate limitations included Gibson's ability to work in coordination with or proximity to others without being distracted by them and her ability to get along with coworkers. Tr. 481-82. Thus, Dr. Russell opined that Gibson "would benefit from a work environment with reduced interpersonal and social demands." Tr. 482. This assessment was affirmed by a reviewing state agency medical consultant on March 15, 2006. Tr. 540-41.

Medical records from UIC dated September 2005 through November 2005 reflect that Gibson received treatment for headaches and infrequent absence-type seizure episodes. Tr. 262, 499-516, 605-11. On September 26, 2005, she had another MRI of

her brain, which was compared with her MRI from 2001. Tr. 514. The MRI results were consistent with, but not diagnostic of, a demyelinating process. Tr. 515. Gibson's treating physician, Dr. Hussaini, noted that she took Advil to treat her headaches, which Gibson described as sharp, intermittent pains in the frontal region of her head. Tr. 499. Despite what Gibson may have previously been told, imaging of her central nervous system (CNS) was *not* indicative of any chronic CNS parasitic infection. Tr. 500. Gibson's electroencephalogram (EEG) was mildly abnormal, but the results were not suspicious for epileptic events. Tr. 505. On October 25, 2005, Dr. Octavia Kincaid, a neurologist, examined Gibson. Tr. 506. She noted that Gibson exhibited a normal mental status evaluation with normal attention, orientation, memory, and language. Tr. 509. Gibson had normal gait, station, coordination, reflexes, and motor strength in her arms and legs. Tr. 509-10. Dr. Kincaid declined to prescribe Gibson seizure medication. Tr. 510. She referred Gibson to Dr. Demetrios Skias, a multiple sclerosis specialist, so that he could evaluate whether the MRI results warranted further testing for multiple sclerosis. Tr. 510, 526. Dr. Kincaid also referred Gibson for a psychiatric evaluation of her depression and bipolar disorder. Tr. 510.

On November 9, 2005, Dr. Mark Johnson, a psychiatrist, evaluated Gibson for the first time about her alcohol dependence and bipolar disorder. Tr. 512. Gibson told Dr. Johnson that she was drinking every day and had no intention of cutting back. Tr. 562. She said that she attempted to commit suicide twice and described the incident in 1988 when she drank and took pills after a domestic violence incident with her husband. Tr. 563-64. Dr. Johnson wrote Gibson a prescription for Depakote for

emotional volatility and Zoloft to treat her depression. Tr. 262, 527, 566. Dr. Johnson did note, however, that Gibson's volatility could be caused by her continued alcohol consumption combined with the volatility of those around her. Tr. 566. At her December 8, 2005 visit, Gibson reported that she did not have suicidal ideations and her sleep and appetite were fair. Tr. 568-69. The next time Dr. Johnson saw Gibson was in February 2006 after an "extended absence." Tr. 571. At that appointment, Gibson admitted to drinking on Valentine's Day. *Id.* Dr. Johnson saw Gibson again on March 24, 2006. Tr. 559. He noted that she was well groomed and gave appropriate responses to his questions, but was tearful at times. Tr. 560. Gibson's motor, speech, and sensory were all normal. *Id.* They discussed switching her antidepressant medication from Zoloft to Lexapro. *Id.* Dr. Johnson also noted that "[h]er MRI showed some degeneration of her thoracic spine, but no nerve involvement or MS, which were concerns of hers." *Id.*

Dr. Skias began treating Gibson in December 2005. Tr. 601. Gibson's chief complaints at her initial office visit with Dr. Skias were leg pains and numbness in her toes. Tr. 601. Dr. Skias noted that her recent brain MRI "showed multiple high sugnal lesions in a pattern suggestive of multiple sclerosis." *Id.* On July 21, 2006, Dr. Skias treated Gibson for problems with her left eye. Tr. 592. Specifically, she reported having blurry vision in her left eye as well as pain behind the eye. *Id.* Dr. Skias diagnosed Gibson with possible optic neuritis, which he noted could lead to a multiple sclerosis diagnosis. Tr. 593. He ordered MRI scanning of her cervical spine and

lumbar spine.  Tr. 262, 593.  Dr. Skias found that Gibson's motor, sensory, reflexes, coordination, gait, and station were all normal.  Tr. 593.  However, Dr. Skias admitted Gibson to the hospital for intravenous steroids to control a suspected multiple sclerosis exacerbation.  Tr. 263.  She was discharged on July 28 with a discharge instruction sheet indicating she had a central vein occlusion and multiple sclerosis exacerbation. Tr. 549, 625.  The discharge summary indicates that Gibson had a spinal tap done since it was "still unclear" if she had a diagnosis of multiple sclerosis.  Tr. 625.

On July 27, 2006, Dr. Skias filled out a social security medical questionnaire stating that Gibson's diagnosis was multiple sclerosis and she was totally disabled beyond the activities specified in his questionnaire.  R. 555.  For instance, Dr. Skias opined that Gibson would need to lie down at unpredictable intervals during a work shift.  *Id.*  She could not stand or walk more than two hours per day and could only sit for thirty minutes before she would need to change positions.  *Id.*  Dr. Skias also stated that Gibson could never balance and could only occasionally bend and stoop.  *Id.*

However, during a later appointment on August 10, 2006, Dr. Skias noted that Gibson displayed normal motor, sensory, reflexes, coordination, gait, and station.  Tr. 598.  He stated that a diagnosis of multiple sclerosis "has not been adequately established yet."  *Id.*  Dr. Skias also noted that vasculitis was a possibility but the lab screen for this had been negative so far.  Tr. 599.  During Gibson's October 5, 2006 visit, Dr. Skias again noted that she displayed intact motor, sensory, reflexes, coordination, gait, and station.  Tr. 596-97.  He also wrote that Gibson's multiple sclerosis diagnosis "had not been established yet."  *Id.*

12

On January 3, 2007, Gibson sought emergency room treatment for complaints of numbness in her extremities, mostly the right arm and leg, as well as worsening blurry vision for one week. Tr. 586-87. She denied any alcohol or drug use. Tr. 589. Gibson's examination showed that she had normal vision – 20/40 right eye visual acuity and 20/25 left eye visual acuity. *Id.* She displayed 4/5ths right extremities strength with a positive Romberg test and some swaying and ataxia. *Id.* After a consultation with the neurologists, a final emergency room report indicated that Gibson had 5/5ths strength in all extremities. Tr. 586. No definitive diagnosis of multiple sclerosis was made. Tr. 591. The CT scan of Gibson's brain dated January 4, 2007 indicated a chronic sinus disease, but was "otherwise unremarkable." Tr. 632. Gibson was sent home with no limits on her activity and without a prescription for steroid medication. Tr. 586-91. She was instructed for follow up with Dr. Skias at the clinic. Tr. 595.

One month later, Gibson was hospitalized for back pain at Evanston Hospital from February 5 through February 7, 2007. Tr. 650-51. She explained to the physicians that she had been in a car accident one week before. Tr. 652. Gibson reported that she was just walking around her house when the pain started. Tr. 664-65. She described it as a shooting pain down her right thigh into her lower leg. Tr. 652. Gibson also stated that she had double vision and intermittent headaches over the weekend. *Id.* She explained that a neurologist at UIC had been treating her for multiple sclerosis, but she had not seen him for months. *Id.* Gibson stated that she was also experiencing numbness in her hands and right heel, which was typical for her

during a multiple sclerosis exacerbation. *Id.* Gibson could only walk three steps before experiencing pain. Tr. 662. When asked if she uses alcohol, Gibson answered affirmatively and stated that she drinks wine when she is feeling depressed and has guilt about her drinking. Tr. 67.

Clinically, she had 4/5ths lower extremity strength and right great toe strength was somewhat weaker than the left great toe. Tr. 660. Gibson displayed 5/5ths strength in the upper extremities and a positive Tinel's sign, albeit she was not treated for or diagnosed with any carpal tunnel syndrome. *Id.* Her cervical spine x-ray imaging showed degenerative disc disease with an osteophyte and mild disc space narrowing. Tr. 263. The physician noted that Gibson's exam and history suggest possible multiple sclerosis exacerbation, but that she also has medical findings and history that cannot be attributed solely to multiple sclerosis exacerbation. Tr. 669.

Due to Gibson's history of depression, she also had a psychiatric consultation during her stay at Evanston Hospital. Tr. 671. At the consult, Gibson told the doctor that she had been drinking approximately one bottle of wine per day to help her sleep and cope with her emotional state. *Id.* She also admitted to using marijuana two to three times per week. Tr. 674. Gibson stated that her drinking had become worse in the six months preceding her hospitalization, and that her last drink was on the previous Saturday. Tr. 671. However, despite these problems, she had not made an appointment with Dr. Johnson in over six months and had not taken Zoloft in over three months. Tr. 674-75. The mental examination showed that Gibson's mood was depressed, but she was alert, logical, coherent, and oriented to time, place, and

situation.  *Id.*  Upon discharge, Gibson was given a wheeled walker for use at home. Tr. 661.  She was recommended to follow-up with outpatient physical therapy and psychiatric treatment.  Tr. 661, 675.

## D.

Based upon the medical record of evidence and the testimony adduced at the hearing, the ALJ applied the five-step sequential evaluation process mandated by the Social Security regulations.  *See* 20 C.F.R. § 404.1520.  The ALJ first found that Gibson was currently unemployed.  Tr. 258.  At step two, the ALJ found that Gibson had the following medically determinable severe impairments: depression/anxiety with possible bipolar disorder; alcohol and marijuana abuse; possible multiple sclerosis; possible seizure disorder; degenerative disc disease; and hypertension.  *Id.*  The ALJ then concluded that none of Gibson's impairments, alone or in combination, met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 259-60.  The ALJ found that Gibson had the RFC (residual functional capacity) to perform light work except that she cannot "climb ladders, ropes, or scaffolds; must avoid even moderate exposure to unprotected heights and hazardous machinery; must work primarily alone; and she is limited to simple, unskilled work without regular general public contact."  Tr. 260.  At step four, the ALJ found that Gibson was unable to perform her past work, and thus proceeded to step five where she found that Gibson was not disabled because she retained the RFC to perform a significant number of jobs that exist in the national economy.  Tr. 266-68.

In reaching that decision, the ALJ also considered the testimony of a vocational expert (VE), Susan Ettenberg. Tr. 185. The ALJ asked the expert to assume a person of Gibson's age, education, and work experience had no exertional limits, but could never climb any ladders, ropes, or scaffolds, must avoid even moderate exposure to unprotected heights, moving and hazardous machinery, and was limited to jobs that are simple, unskilled, do not have regular general public contact, and the person could work primarily alone. Tr. 223. Given these assumptions, the VE testified that there would still be a substantial number of jobs Gibson could perform. *Id.* She named five examples including a food preparation worker, light housekeeper, assembler, machine operator, and janitor. Tr. 223-24. The VE specified that the first three jobs listed were light exertion jobs, while the latter two were medium. *Id.* With respect to the light jobs, the ALJ inquired whether allowing Gibson to alternate between sitting and standing every forty-five minutes to an hour and require no repetitive grasping would eliminate any of the job options. Tr. 224. The VE testified that only the assembler job would be eliminated. Tr. 225.

### III.

Judicial review of the SSA's decisions is governed by 42 U.S.C. § 405(g); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). When, as here, an ALJ's decision constitutes the final action of the SSA, the Court's task is to examine the decision "to determine whether substantial evidence supports it and whether the ALJ applied the proper legal criteria." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. Jan. 13, 2011);

*Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). The Court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 2001). Finally, while "judicial review of the decisions of administrative agencies is deferential, it is not abject" and this Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (internal citations omitted); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues).

## IV.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. *See* 42 U.S.C. § 423(d). The claimant must show that she is "disabled" due to her inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. § 423(d)(1)(A). The claimant must also establish that she was disabled on or before her

date last insured (DLI). § 423(a)(1)(A), (c)(1); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

A claim of disability is evaluated under a sequential five-step analysis. *See* 20 C.F.R. § 404.1520; *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004). In the first step, the ALJ considers whether the claimant is working and whether such work is "substantial gainful activity." § 404.1520(b). If the claimant is not working, the ALJ will address step two: whether the claimant has an impairment or combination of impairments that is "severe." § 404.1520(c). At step three, the ALJ determines whether the claimant's severe impairment meets or medically equals any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. If the impairment meets or equals one of the listed impairments, then the applicant is conclusively disabled. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). If the impairment does not meet or equal a listed impairment, the evaluation continues to an assessment of the claimant's residual functional capacity. *Id.* Once the claimant's RFC is determined, the ALJ will evaluate whether she can perform her past relevant work. If she is unable to perform past relevant work, the analysis proceeds to the fifth and final step: whether the claimant is able to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof regarding her disabling conditions at steps one through four. § 404.1514; *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991). At step five, the burden shifts to the SSA to prove that a significant number of

jobs are available in the national economy for an employee with the claimant's ability. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In this case, Gibson contends that the ALJ erred at steps two through five.

### A.

Gibson first argues that the ALJ erred by not considering other severe impairments. R. 20 at 7-9. She contends that the ALJ should have classified the following as severe impairments: (1) her back pain (particularly the annular tear at L5-S1); (2) her hand and arm pain; (3) her deficient vision; (4) parasitic brain infection; and (5) vasculitis.

At step two, the burden is on the claimant to establish that she has an impairment that is severe. *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). A severe impairment is an "impairment or combination of impairments which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 404.1521(a); *Castile*, 617 F.3d at 926. Basic work activities are "the abilities and aptitudes necessary to do most jobs," including "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b); *Orr v. Astrue*, 2010 WL 4192831, at *9 (N.D. Ill. Oct. 18, 2010). "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p.

Gibson first argues that the ALJ failed to consider her annular tear at L5-S1 impinging on the right SI nerve root as a severe impairment. R. 20 at 7. The ALJ

assessed the medical evidence from Gibson's February 2007 hospitalization for back pain. Tr. 259-60. Specifically, the ALJ found that Gibson's "[b]ack problems are not expected to result in disabling limitations for 12 consecutive months. Improvement is expected, especially since the claimant testified a week after the sudden onset of back pain started that she was going to follow-up with aftercare and recommended physical therapy." Tr. 260. The ALJ does not deny that Gibson may have suffered from back pain. Instead, the ALJ determined that the pain was not severe and Gibson "has not submitted any updated medical records post the February 2007 hospitalization to support duration/persistence of back pain problems." Tr. 264. The ALJ's finding is supported by substantial evidence in the record.

Next, Gibson argues that the ALJ failed to consider her hand and arm pain as a severe impairment. R. 20 at 7-8. In her brief, Gibson cites medical evidence in the record, including the January 4, 2007 neurology report which states that Gibson had "decreased pinprick sensation in the finger tips bilat [sic] extending to the hypothenar eminence on the left hand." *Id.* at 8; Tr. 594. Gibson also cites to the October 5, 2006 neurology report stating that "[t]he aprestheisias on the hands continue, worse on the left." R. 20 at 8; Tr. 596. However, again, she fails to show how the ALJ's finding that these were non-severe impairments is not supported by substantial evidence. The ALJ considered the evidence in the record related to Gibson's hand numbness and found that these symptoms were only reported to doctors during multiple sclerosis exacerbations. Tr. 264. Additionally, the information Gibson cites from the October 5, 2006 report was taken from her own description of her symptoms and is not based

20

on objective medical evidence. Tr. 596. Gibson also claims the ALJ failed to consider whether her arm/hand impairments could be related to the herniated cervical discs, as opposed to just being related to MS. R. 20 at 8-9. However, Gibson does not cite to any evidence showing that her arm and hand pain could be related to the herniated discs, nor does she explain how such a finding would change the ALJ's severity determination. R. 20 at 9. Gibson has the burden of demonstrating that her impairments are severe. The ALJ's finding that Gibson "is not prevented from performing basic arm/hand work-related activities" is supported by substantial evidence. Tr. 259.

Third, Gibson argues that the ALJ should have considered her visual impairments as a severe impairment. R. 20 at 8-9. It is clear from the ALJ's decision that she considered the evidence of Gibson's vision problems. *See* Tr. 262-63. Gibson fails to show how this evidence demonstrates that her vision impairments had a more than minimal limitation on her basic work activities and, thus, should have been categorized as severe. *See Castile*, 617 F.3d at 926. As the ALJ points out, evidence also shows that Gibson's vision was normal. Tr. 263 (citing Tr. 586). The ALJ evaluated Gibson's visual limitations and did not dismiss an entire line of evidence that might be contrary to the ruling. *Cf. Bergner v. Astrue*, 2010 WL 2710591, at *4 (N.D. Ind. July 7, 2010) (ALJ's failure to minimally articulate that he at least considered, directly or indirectly, plaintiff's alleged impairment warranted remand at step two). Here, the ALJ's decision to evaluate Gibson's visual impairments as non-severe impairments is supported by substantial evidence.

Gibson argues that the ALJ erred by not classifying her parasitic brain infection as a severe impairment. R. 20 at 8. She cites one MRI report from 2001 in which the physician included parasitic infestation in his differential diagnosis.[3] However, the mere existence of some evidence contrary to the ALJ's decision does not render the evidence on which the ALJ relied insubstantial. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Here, the ALJ expressly evaluated Gibson's alleged parasitic brain infection and concluded that the evidence in the record showed it was not severe. Tr. at 258. Specifically, a CNS imaging in October 2005 was "not indicative of any chronic CNS parasitic infection, in contrast to what [Gibson] reported she had been previously told." Tr. at 500. Again, the ALJ's determination is supported by substantial evidence.

Finally, Gibson argues that the ALJ failed to consider her vasculitis as a severe impairment. Gibson cites one report in which Dr. Skias noted that vasculitis was a possibility. R. 20 at 8; Tr. 599. As with the other alleged impairments, the ALJ's decision not to include vasculitis as a severe impairment was not against the substantial weight of the evidence. The Court affirms the ALJ's finding with respect to step two.

Gibson's argument that the ALJ's decision at step two is not supported by substantial evidence because "all these conditions would interact and diminish capacity to perform light work" is unavailing. R. 20 at 9. The ALJ considers the interaction of

---

[3]"Differential diagnosis" is defined as "the determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings." Dorland's Illustrated Medical Dictionary 514 (31st ed. 2007).

all impairments at the RFC stage, which immediately precedes step four. *See* 20 C.F.R. § 404.1545(a). As will be discussed later, the ALJ properly considered all of Gibson's impairments – severe and non-severe – in determining her RFC. *See infra* at § IV.C.

**B.**

Gibson contends that the ALJ erred at step three because she failed to analyze whether her other impairments, "including herniated cervical discs, impingement of the right SI nerve root and compelling evidence of severe visual impairment bilaterally," met or medically equaled a listing. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. At step three, the ALJ must determine whether Gibson's *severe* impairments meet or medically equal the criteria of a listed impairment. *See Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002) (emphasis added). As discussed above, the ALJ did not find that these impairments were severe. It was not necessary for the ALJ to determine whether Gibson's *non*-severe impairments met or medically equaled a listing.

Gibson also argues that the ALJ should have assessed "the possibility of [her] meeting Section 12.02 for organic mental disorder based upon abnormal brain MRI's." R. 20 at 10. However, as the Commissioner points out, Gibson fails to identify any record evidence establishing that she exhibits either the specific medical findings or the functional limitations required to meet Listing 12.02. R. 24 at 2. Gibson has the burden of showing that her impairments, alone or in combination, meet or medically

equal all of the requirements of a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (in order to match a listing, the claimant must show that his impairment meets *all* of the specified medical criteria); *Rice*, 384 F.3d at 369. None of the opinions of Gibson's treating physicians address the question of medical equivalency. *See Scheck*, 357 F.3d at 700*; Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988); *see also Sims*, 309 F.3d at 429. Gibson argues that she qualifies under Listing 12.02 because "the record is replete with psychological or behavioral abnormalities associated with dysfunction of the brain as definite changes in personality, disturbance and mood with emotional liability." R. 20 at 9-10. However, Gibson fails to identify any evidence showing that her symptoms met or equaled in severity the criteria under Listing 12.02. None of her physicians went "so far as to render an opinion on the issue in question – medical equivalency." *Steward*, 858 F.2d at 1299.

Contrary to Gibson's assertion, the ALJ's analysis at step three was not perfunctory. *See* R. 20 at 10. "[A]n ALJ need not address every piece of evidence in his decision . . . [he] need only build 'a bridge from the evidence to his conclusion.'" *Sims*, 309 F.3d at 429 (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)). Here, the ALJ stated that she specifically considered Listing 12.04 (affective disorder), Listing 12.09 (substance addiction disorder), Listing 11.09 (multiple sclerosis), Listing 11.03 (epilepsy), Listing 3.00 (respiratory system), and Listing 14.00 (immune system abnormalities). Tr. 259-60. The ALJ considered various listings, but the evidence did not demonstrate that all of the criteria for any listing was satisfied. *Id.* This is not a

case where the ALJ discussed only evidence that favors her decision. *See Herron v. Shalala*,19 F.3d 329, 333 (7th Cir. 1994). To the contrary, the ALJ discussed Gibson's impairments in detail and cited to many of the medical reports she provided. *See Rice*, 384 F.3d at 369-70. Therefore, substantial evidence supported the ALJ's finding with respect to step three.

## C.

Before proceeding to step four of the analysis, an ALJ must determine the claimant's residual functional capacity based on all of the relevant medical and other evidence. 20 C.F.R. § 404.1520(e) ("Determining a claimant's RFC is a legal decision reserved to the Commissioner."). The claimant's RFC is the maximum that she can still do despite her mental and physical impairments. § 404.1545(a)(1). In determining what a claimant can do despite her limitations, the ALJ must consider the entire record, including all relevant medical and nonmedical evidence, as well as the claimant's own statements of what she is able to do or unable to do. *Id.* The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to her past work or to different available work. § 404.1545(a)(5).

With respect to Gibson's RFC, the ALJ determined that she is limited to light work, with some additional restrictions. Tr. 267. A job qualifies as light work when it involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. §416.967(b). Light work jobs require a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm or leg controls. *Id.* The ALJ found that Gibson is restricted to light

work and, further, is precluded from climbing ladders, ropes, or scaffolds and must avoid moderate exposure to unprotected heights and hazardous machinery. Tr. 260, 266. The ALJ also found that Gibson must work primarily alone and is limited to simple, unskilled work without regular general public contact. Tr. 260. The ALJ stated that she considered all of the evidence of record, including Gibson's statements, in making her RFC determination. *Id.* Gibson argues that the ALJ's analysis is flawed because the ALJ failed to (1) evaluate Gibson's ability to walk and stand; (2) define functional limitations with respect to Gibson's mental RFC; (3) include Gibson's severe impairments in the RFC analysis; (4) credit Gibson's testimony; and (5) attribute any weight to Gibson's treating physician's opinion. R. 20 at 10-15.

### 1.

First, Gibson argues that the ALJ's RFC analysis requires reversal because she failed to make a "function by function assessment" pursuant to SSR 96-8p. R. 20 at 10. Specifically, Gibson claims that the ALJ made no RFC finding regarding Gibson's ability to stand and walk. *Id.* SSR 96-8p instructs ALJs to assess a claimant's work-related abilities on a "function-by-function basis" before classifying her residual functional capacity in exertional terms (e.g., "light work"). *See Zatz v. Astrue*, 346 Fed. Appx. 107, 111 (7th Cir. 2009). However, the ALJ's duty under SSR 96-8p is not as onerous as Gibson suggests. *Id.* A function-by-function assessment of an individual's limitations ensures that the ALJ does not overlook an important restriction and thereby incorrectly classify the individual's capacity for work. *Id.* (citing SSR 96-8p). "Although the 'RFC assessment is a function-by-function assessment,' the expression

26

of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. 2009) (quoting SSR 96-8p) (citations omitted).

As in *Knox*, the ALJ in this case satisfied the discussion requirements by analyzing the objective medical evidence, Gibson's testimony (and credibility), and other evidence. *Id.* Gibson contends that medical reports from January and February 2007 (Tr. 586-91) demonstrate that Gibson is unable to do light work. R. 20 at 12. However, the ALJ discussed these reports at length during her RFC analysis. Tr. 263. It is clear from the ALJ's decision that she found that Gibson was not limited in her ability to sit or stand, except as expressed in the RFC. Gibson fails to show how the ALJ overlooked the January and February 2007 medical reports, nor does she explain how any evidence in the record, including the test results from her January and February 2007 hospitalizations, would undercut the ALJ's conclusion that she retains the RFC to perform light work.

**2.**

Gibson argues that the ALJ's RFC determination should be reversed because she failed to consider Gibson's mental limitations before concluding that Gibson was capable of simple, unskilled work without regular general public contact. R. 20 at 10-12. In particular, Gibson claims that the ALJ did not properly account for the mental limitations outlined in the state agency physician's mental RFC assessment. *Id.*; Tr. 480-83. Gibson recites the abilities necessary to perform competitive, renumerative, unskilled work (R. 20 at 11), however, the ALJ limited Gibson to simple, unskilled

work without regular general public contact.  Tr. 266.  Gibson also claims that the ALJ ignored treatment notes from her visits with Drs. Norton Knopf and Mark Johnson. R. 20 at 13-14.

In determining Gibson's mental RFC, the ALJ relied on reports from state agency mental health professionals.  Tr. 266.  For instance, one of the state agency consultants found that Gibson was not significantly limited in many of the mental categories.  Tr. 480-81.  The physician noted that Gibson "would benefit from a work environment with reduced interpersonal and social demands."  Tr. 482.  The ALJ adopted this opinion and found Gibson's mental RFC limited her to "simple unskilled work activities without regular general public contact and she would need to work primarily alone."  Tr. 266.  Gibson does not point to any evidence that conflicts with the state agency physician's assessment or the ALJ's mental RFC conclusion.  Nor is it necessary for the ALJ to discuss every aspect of a physician's report when determining an individual's RFC.  Indeed, the ALJ need not provide a written evaluation of every piece of evidence, but need only "minimally articulate" her reasoning to connect the evidence to her conclusions.  *Rice*, 384 F.3d at 371.  Here, the ALJ fulfilled this obligation and substantial evidence in the record supports the ALJ's conclusion that Gibson retained the mental RFC to work primarily alone and perform simple, unskilled activities without regular general public contact.  Gibson does not explain how the treatment notes from Drs. Knopf and Johnson conflict with the ALJ's RFC finding and she incorrectly asserts that the ALJ ignored this evidence.  R. 20 at 13-14.  In reality, the ALJ discussed Gibson's visits with Drs. Knopf and Johnson at length in her

28

decision. Tr. 262. Neither physician offered an opinion as to Gibson's mental limitations. The ALJ did not err with respect to determining Gibson's mental RFC.

### 3.

Next, Gibson claims that the ALJ's RFC analysis is flawed because she failed to consider "many of [Gibson's] severe impairments" before concluding that Gibson is capable of performing light work with some additional limitations. R. 20 at 12. As discussed above, Gibson claims that the ALJ should have classified the following as severe impairments: (1) her back pain (particularly the annular tear at L5-S1); (2) her hand and arm pain; (3) her deficient vision; (4) parasitic brain infection; and (5) vasculitis. With the exception of the alleged vasculitis (which was only considered a possibility and never diagnosed, *see supra* at § IV.A), the ALJ expressly considered each of these impairments in her RFC discussion. Tr. 261-66. Additionally, Gibson fails to explain how the medical evidence related to these alleged impairments is inconsistent with the ALJ's determination that Gibson is capable of performing light work. Other than Dr. Skias's opinion, which the ALJ rejected, Gibson did not present any evidence showing that her medical problems interfere with her ability to do light work, subject to the additional restrictions delineated by the ALJ.

### 4.

Gibson contends that the ALJ improperly rejected her testimony as not credible. R. 20 at 15. An ALJ's credibility assessment is "afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). The ALJ's determination will not

be reversed "unless it is patently wrong." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). In determining credibility, an ALJ must consider several factors, including the claimant's testimony and daily activities, her level of pain or symptoms, aggravating factors, pain medication taken, treatment, and limitations. *See Herron*, 19 F.3d at 334; 20 C.F.R. § 404.1529(c); SSR 97-6p. Discrepancies between objective evidence and self-reports may suggest symptom exaggeration. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). It is true that an ALJ cannot disregard a claimant's subjective statements about disabling pain solely because they are not substantiated by objective medical evidence. *Id.*; 20 C.F.R. § 404.1529(c)(2); *Clifford v. Apfel*, 227 F.3d 863, 871-72 (7th Cir. 2000). Instead, an ALJ should compare the consistency of a claimant's statements against objective information in the medical record, SSR 96-7p, and the credibility determination will only be disturbed if that finding is "unreasonable or unsupported," *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). Furthermore, Social Security Regulations require that an ALJ articulate "specific reasons" behind credibility evaluations." SSR 96-7p; *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (ALJ must provide specific reasons for credibility determination, grounded in the evidence and articulated in the decision); *Steel v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).

Here, the ALJ provided more than enough substantial evidence to support her adverse credibility finding. The ALJ correctly considered the following in making a credibility determination as to Gibson: Gibson's testimony was inconsistent with statements documented in her medical records; Gibson withheld important information

about her earnings until the day of the hearing; Gibson was not compliant with medical provider recommendations; and Gibson has no more than mild limitation socially or in daily activities. Tr. 264-65. The ALJ adequately articulated her reasons for discrediting Gibson's testimony and provided substantial evidence to support her decision.

## 5.

The governing regulations state that an ALJ must give a treating source's medical opinion controlling weight if two conditions are met: (1) it is supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) it is not inconsistent with substantial evidence in the record. 20 C.F.R. §404.1527(d)(2); *Elder v. Astrue*, 529 F.3d 408, 415-46 (7th Cir. 2008). A "treating source" means a claimant's "own physician, psychologist, or other acceptable medical source who provides [her], or has provided [her], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. If an ALJ decides to reject a treating physician's opinion, he must apply the factors listed in the regulations and "give a good reason" for her decision. *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). "The ALJ is not required to give controlling weight to the ultimate conclusion of disability – a finding specifically reserved for the Commissioner." *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010).

Gibson argues that the ALJ improperly rejected the opinion of her treating neurologist, Dr. Demetrios Skias, rendered on July 27, 2006. R. 20 at 14; Tr. 555. The

Court disagrees. The ALJ identified inconsistencies between Dr. Skias's July 27 report and his other treatment notes and the ALJ's decision to attribute no weight to the July 27 report is well-reasoned. Tr. 266. Specifically, on July 27, 2006, Dr. Skias concluded that Gibson's multiple sclerosis renders her "totally disabled" and precludes her from doing most work requiring physical activity. Tr. 555. However, Dr. Skias's treatment records from July 21 and October 5, 2006 state that Gibson had normal motor, sensory, reflexes, coordination, gait, and station. Tr. 592-93, 596. Significantly, Dr. Skias's treatment notes also indicate that he could not definitively establish that Gibson had multiple sclerosis. Tr. 266. The ALJ determined that Dr. Skias's treatment notes conflicted with his July 27 report and, thus, elected to disregard the latter opinion. *Id.* The ALJ further reasoned that the July 26 report was unreliable because the assessment took place while Gibson was hospitalized for a possible multiple sclerosis exacerbation. *Id.* The ALJ's discussion of the lack of consistency and support for Dr. Skias's opinion is enough to build an "accurate and logical bridge" from evidence to conclusion. *Craft*, 539 F.3d at 673. For these reasons, the ALJ discounted Dr. Skias's July 26 report and this Court will not overturn the ALJ's decision.

**6.**

Finally, Gibson argues – in one sentence – that the ALJ's step five finding is not supported by substantial evidence because the ALJ failed to include all of Gibson's limitations in the hypothetical question used to elicit the opinion of the vocational expert. R. 20 at 15. Gibson does not specify which limitations the ALJ's hypothetical

was lacking or how the hypothetical was otherwise flawed.[4]  In her response brief, Gibson states that "the hypothetical posed to the VE only reflected conclusions about the type of work that could hypothetically be performed, not [Gibson's] functional limitations."  R. 25 at 4.  Nonetheless, the Seventh Circuit has held that "when considering the appropriateness of a hypothetical question posed to a vocational expert, '[a]ll that is required is that the hypothetical question be supported by the medical evidence in the record.'"  *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993) (quoting *Ehrhart v. Secretary*, 969 F.2d 534, 538 (7th Cir. 1992)).  Here, the hypothetical question posed by the ALJ reflected Gibson's impairments to the extent they were supported by medical evidence in the record.  Moreover, as in *Cass* and *Ehrhart*, the VE reviewed Gibson's full medical reports and documents before rendering her assessment (Tr. 222-23); "therefore the vocational expert's testimony constitutes *substantial evidence* to support the ALJ's holding despite any omissions in the hypothetical."  *Cass*, 8 F.2d at 556 (emphasis in original).  Thus, the Court finds that the ALJ did not err in either framing the hypothetical question or relying on the VE's response as substantial evidence of Gibson's ability to work.

---

[4]Failure to develop an argument constitutes waiver. *See Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) (arguments not developed are deemed waived).

## V.

For the reasons discussed above, the ALJ's finding of "not disabled" is supported by substantial evidence and free of legal errors.  Defendant's motion for summary judgment is granted [R. 21], and the Plaintiff's motion is denied [R. 19].

ENTERED:

_____
Honorable Edmond E. Chang
United States District Judge

DATE: April 22, 2011